versus Faunce et al. Okay. Oh, oh. Hmm. Okay, that's, that's all. Okay. Got it. James Tetz. Your Honor, your Honors, Mark Roselli from law firm Roselli, Griegel, Legere, and Lozaro again on behalf, in this instance, on behalf of the appellant, Scott Faunce. Again, what we have for your Honors is our appeal of the denial of a motion for new trial that we had filed on behalf of Defendant Scott Faunce in the Louis Mejia's matter. And your Honor, what I'm saying is that in this instance, Judge Kugler denied our motion for a new trial. And I believe, based upon the arguments that we raised in our briefs, the fact that plaintiff's counsel's closing argument went beyond the bounds of what's decent and duly prejudiced the jury and therefore had an effect on the verdict. Now, Judge Kugler addressed all of the objections that were lodged at the end of the summation and, in fact, instructed the jury on several aspects with what seemed to be the agreement of counsel. Correct, Your Honor. How can we find that any aspect of what you're complaining of constituted plain error? Your Honor, the reason is a couple things. Number one, obviously closing, when you're in counsel, and I was trial counsel for that matter, you're sitting there, you're listening to the closing arguments. You try to pick up as many of these items as you can. And I tried to address as many as I could with Judge Kugler. It wasn't until after the fact that there were other items that weren't raised that became patently obvious that showed that Mr. K had exceeded the bounds. There were no exceptions taken, except the ones that Judge Randell just pointed out at the end of the, after the summations. And it's a very benign attitude that was taken at that point, or everything that the judge recharged or explained was satisfactory to you. Well, Your Honor, actually, unfortunately, written word doesn't, and being there, cannot be replicated. Like, as I said, the fact that I didn't raise all the items that later became apparent on the record is not fatal. I mean, there are courts' decisions would say that the failure to object to every item does not render the appeal moot. What was it specifically? I mean, the problems that we see in summations is where it calls upon the jury to divert them from the evidence so that they are deciding based upon passion, bias, et cetera. I read the summation, and it seemed a lot of it was certainly argumentative, certainly characterizing evidence in a way favorable to the plaintiff. But that's what happens. And the jury sits there and realizes some of it is hyperbole. But what was it that appealed so to the passion that the jury did, therefore, we can conclude, did not decide based on the evidence? Sure, Your Honor. One thing I've neglected, I wanted to reserve two minutes for rebuttal. I'm sorry, I apologize. Basically, Your Honor, I think what's important is that the fact that the Plaintiff's Counsel on multiple occasions not only attacked the defendant's character, he also attacked my character, making my credibility an issue. And that was raised. The Brooklyn Bridge? Yes, Your Honor. Well, I mean, the jury. Your Honor, I think that screams liar. I think if anybody hears that, and you're out on the street, and someone says, I have the Brooklyn Bridge, I think that screams liar. My credibility's not at issue. And he continued. But the jury was told that. Was told the arguments are just arguments. And I would refer to the Fineman decision, which we cite in our reply brief, where Judge Bissell was a trial judge in that instance, as a matter of fact, where, again, he gave curative instructions. Mr. Rosselli, you're talking about a point in your brief that all three of us have been district court judges, and we've heard summations, and we've heard some hyperbolic statements. And I don't like to divert you from the answer to Judge Rendell, but frankly, I've got a real problem with Mr. Mahas's brief, and that has to do with the punitive damages, because as you probably have gathered, I, and I have no hesitancy telling you, I am not impressed with the fact that what was said on summation was so prejudicial that a judge should have granted a new trial. But what happened was the jury came back with, how much in punitive damages? 200,000, Your Honor. 200,000. How much in compensatory damages? 45,000. And has there been anything like the 200,000 that has ever been rendered in any of these cases in favor of any of the inmates? No, Your Honor. And I think that's indicative, though, gets back to the emotion of the jury. The largest award in the Lindsay matter, which actually is also for Your Honors, was I think $46,500. Are you familiar with the recent Exxon case that Justice Souter wrote, which was admittedly written in a maritime context, not in this kind of context? Are you familiar with that case? Your Honor, I can say that I know it came down, and I know it had to do with punitive damages. I have not read it thoroughly, so I certainly wouldn't be versed on it. Well, Justice Souter, for the Supreme Court, opted for a one-on, a ratio of one-on-one. Right, right part I knew. That's right, Your Honor. And that leaves me with the big question of where there was no application made to the district court judge for a remittitor, whether we can consider it on the basis of abusive discretion. Well, actually, Your Honor, we did make application in our motion, it included a remittitor claim as well. It was a new trial based upon, and it's in our brief, but that was part of our application to Judge Kugler. But coming before us, you have not urged that the remittitor was wrong. You have urged just that punitive damages shouldn't have been awarded at all, haven't you? Well, we raised the remittitor issue in our brief, Your Honor. If you believe it was at, and that's part of the relief that we did request. Referring to page 43 of your brief? Correct, Your Honor. It starts at page 43. And 46, actually, we're entitled to remit to request the award granted by the plaintiff that a really improper verdict is unsupported by the evidence. So we- It's not an issue that was raised in our, in the brief before us. You said a new trial due to the improper verdict entered as a result of the prejudicial conduct of the plaintiff's counsel. And then you've got all these statements. And then you've got a second point that the defendant's motion for judgment as a matter of law and remittitor should be granted in light of the improper verdict entered by the jury and the fact that the award is not supported by the weight of evidence. What did you ask the district court for? Again, to reduce the, to reduce the award based upon- To what? Um, I don't recall. I don't know that we gave an amount. I don't have the pleadings in front of me. I can't articulate what the amount was. But presumably, in that instance, our request would have been- And Judge Cougar referenced the fact that in his opinion, he was concerned about the punitive damages because the defendant, in this instance, didn't assault anybody. It would have been supervisory liability. And he was somewhat concerned. But at that time, the law was different. Usually, if it was a multiple of a single digit, the court felt that that was appropriate. Obviously, the Exxon decision came subsequently. But I think why that's also important, Your Honors, is the fact that that punitive damages goes to the emotion. It goes to the very emotion of this jury. The record shows that this plaintiff appeared at one of the hearing dates late. On another day, the record will show that he fell asleep at his trial at the table. It wouldn't be a sympathetic plaintiff. And then on cross-examination, if you read the record, Your Honor, I showed, and I showed the many inconsistencies that were blatant, that the jury clearly saw that. And notwithstanding that, that's notwithstanding that, and I've tried- But they gave punitive damages. They did give punitive damages, Your Honor. They gave punitive damages of $200,000. You don't recall at what sum you asked the district court- My sense would be, Your Honor, is that on the remitter, we would ask that the punitives be reduced to zero. And if we hadn't raised that, I'll raise that now. But you're assuming, then, that there's absolutely no way on this record that a jury could properly find punitives. The court instructed very specifically on punitives. They did. Gave a lot of detail. I read Mr. Fonce's testimony. It was characterized on summation as that he was in denial. And quite frankly, reading his testimony, I found it pretty much in denial. He was willing to acknowledge almost nothing. Your Honor, except- This, do you- No, no, no. There were- And also the fact that his wife was the head of the investigation unit where things were referred. I mean, there was an aura here created of laissez-faire. I'm sending it over there. What happens, happens. Even though he knew, acknowledged that he knew from day one, that there were two and three assaults occurring each day. So, I mean, to read this, and Judge Kugler's statement that he knew and did nothing, and that upset the jury greatly. I mean, you can interview juries after the fact, and they hang on a couple things in finding they really don't like what someone did. Tell us how we can say that absolutely there was no basis here for punitive damages which would reflect an indifference, a deliberate indifference on the part of funds. Because before you get to the indifference standard, you have to show that the plaintiff was actually assaulted. And I think that's where the breakdown is. Well, they gave $45,000 in compensatory damages. They believed him. There was testimony from nurses. I mean, there was testimony from which you could determine that he had bruises. He had a single bruise that was on the side, a single bruise. That matched the stick. Did not match his testimony as how he received that bruise. That was the problem. But you're arguing the jury clearly found that he had been assaulted. Well, obviously they did. They credited the testimony. If there's one witness that said yes and 10 that said no, they can credit. But that's why I believe that it was the closing argument, which they relied upon in order to award the damages and the punitives especially. Mr. Roselli, are you going to, your point is that we should grant, order the district court to order a new trial over the jury's verdict. I will tell you, you are never going to convince me of that on this record. You might be able to get more profit and benefit from addressing the issue that I presented to you, whether or not the punitive damages should be reduced unless, of course, your client is flush and doesn't care whether he pays the $200,000. Well, certainly that's not true, Your Honor. I mean, obviously my first preference would be a new trial. And again, based upon the arguments you raised. Okay, we know that. Right, on the reminder, Your Honor, again, I think that the punitive damages were excessive based upon, even if you assume that that was the, he did get assaulted, the fact that that particular incident wasn't, there were things taken. The injury was not that severe. What would you support a lower punitive damage award with? Your Honor, what I would say is that you would be bound by the current Supreme Court law that talks about a one. The Supreme Court law doesn't deal with it. It deals with a maritime, as I said, with a maritime issue. The Supreme Court has never come out and said the ratio on punitive damages should never exceed one to one. They've never said that. Right. There are indications that perhaps it may be forthcoming in the future. Of course, Justice Souter is leaving the court and I'm not at all sure that he'll have another punitive damage case. Correct. And what the Supreme Court will do with the rest of them, I don't know. I want you to hear your argument. Well, Your Honor, again, based upon the facts of the case and based upon compounded by the closing argument, I think that the punitive damages in this instance far exceed the compensatory award and aren't justified. And again, if you look to the prior trials and the punitive awards in those trials as a guide, I think that would be necessarily appropriate, the amount. And there were multiple defendants in those other instances, not a singular defendant. Here we have a singular defendant and the total amount of those punitive damages exceed the other awards combined, including, I believe, the compensatory awarded in this particular instance. So I think that- Your Honor, rebuttal, is that sufficient? Judge Garth, you have a question at this point? No, I'm okay. You're all right? Did the judge ask you? No. All right, we'll hear from you on rebuttal. Thank you. Why can't you get, why can't you get somebody to stick to the punitive damages? Good morning, Your Honors. Good morning. Good morning. Let me just briefly address- Would you speak into the microphone a little louder, please? Of course, Your Honor. Lift it up, please. Terrific. It seems like I have a height advantage here, or a disadvantage, perhaps. Let me just speak briefly about what the record revealed and what the jury certainly had the right to find, and did find. Would you be good enough to invert the argument, only because I have- That doesn't mean stand on your head. I was thinking that way, Your Honor, but- Means address punitives first. I'm sure Judge Garth would not ask a lawyer from New Jersey to- No, I wouldn't do that, but I would really like to hear you first on punitive damages, particularly since you heard me say, at least as one of the panel, that I would never have directed the district court judge to order a new trial. Yes, and I- So you at least got one third. But I'd like to hear you talk about punitive damages. And that's really where I was trying to go, Your Honor. Oh, good. That's precisely what I'd like to hear. And by way, really, of introduction to that, I simply want to say that Judge Kugler was right to say that this record gave the jury ample cause to award punitive damages. There was a plaintiff here, like any prisoner, who is in a completely defenseless position, particularly in the context of the factual proofs that the jury heard here, where there were dozens and scores of riot-clad troops brought in, and a 30-day lockdown, and he was down on the farm, the minimum custody. Should we consider the amount of punitive damages that were awarded in other cases that arose out of this scenario, in terms of testing the reasonableness of the punitive damages awarded here? I think you certainly can, and I'd like to speak to that, because, first of all, you have the Tavius Lindsey case before the court. No argument is scheduled in it today. But my recollection is that- They awarded $35,000 in punitive damages in that case against three different defendants. Right, but what you have is $35,000 in punitives- And this was awarded against Mr. Fonce, $15,000? I don't recall those numbers, Your Honor, but I believe that the multiple was three or four, if you take the compensatories over to the punitives. Let me remind you, and then you can address Judge Vonesky's question. Mr. Mayhaus had $200,000 in punitive damages, Mr. Lindsey, $35,000, Mr. White, $12,000, Mr. Riley, $20,000, Mr. Watford, $20,000, and then Mr. Springer, DeWitt, Phillips, Brown, Phelps, Smith, Fagan, Nordl, Carlese, Henderson, Hussey, Mitchell, and Short. No punitive damages at all, although they had compensatory damages. I think Your Honor now is giving us a list of results from the special master in those cases. They were not cases that were tried to jurors. Those were the ones that I was able to collect, and if I'm wrong on it, you can correct me. I really was trying to- I'm not always right, you know. And certainly the same is true for counsel, Your Honor, but I was thinking about the two jury verdicts we have here, which were the compensatories for Laverne White, a result that was affirmed by this circuit, although punitives were not challenged in that case. That's the one verdict we had with a jury that actually has gone through the appellate process, and the case has been sustained, and the judgment's been paid. That was, I think, about 1,000 or 2,000 in compensatories, and a total of 19,000. So it was really roughly six or seven or eight to one, it seemed to me. Well, but let's not talk about ratios. I mean, we've been told over and over, we're not supposed to. You know, there's not supposed to be a proportionality set, but when you think of 200,000 here, four of the same people who were involved in the decision-making that obviously, you know, if not exactly the same, they did the same conduct, and here it's 200,000. Shouldn't we look askance at that and say that is just too much, that in fact, some of that argument may have gone overboard and appealed to the passion as compared to the reasoning process of the jury? Well, two things, Judge. I think, of course, every case has to stand on its own facts, and if we look at the facts of this case, which is where I was starting this discussion, the facts of this case were particularly egregious in the sense that not only did we have what Your Honor, I think, correctly describes as a kind of denial that emanates from a review of the testimony of Mr. Fonce at trial, but we also had a very careful procession of facts laid before the jury which showed that Scott Fonce was in the gymnasium on August 2nd at the same time that Margaret Labacque, his ombudsman, the ombudsman of the Department of Corrections, was in that same gym and saw four or five people with evident facial injuries, bleeding and so forth, that she wrote a report about it, she sent the report to Fonce, that she saw Fonce at the end of that day, that she reported on these matters and also reported, as I recall, the record reported that these were people who seemed to be terribly frightened. They had SOG handlers next to them. So from August 2nd, and now remember, Mr. Mejia suffers his injuries on the 14th. I remember that, is that correct? I believe he said in his testimony he had no recollection of that, but Margaret Labacque testified clearly that not only did she tell him about that, but he was in the gymnasium that day himself as well. So we have that, we have other indications around the 5th or the 6th that were in this record of Mr. Fonce being put on notice by either letters or memos or reports from ombudsman, and then we have his own admission that he had opined or characterized, I would say dismissed or trivialized the reports of injury as these inmates perhaps falling out of bed or running into furniture. So when you took- Do we know the testimony in other, do we know the testimony in other cases? I guess that's where we could compare other versions. Well, let me give you an example in that regard. My recollection of the, I actually helped try the Lindsay case, so I have a better recollection. I wasn't trial counsel here in Mejia's, but in the Lindsay case, what we presented- In which case? The Tavius-Lindsay case, which is before your honor. If we take this example of Scott Fonce suggesting that maybe people were falling out of bed or running into furniture, I'll take that as an example. What we had in the Mejia's case is that Fonce admitted on cross-examination, it was a rule 611 direct, as if on cross. He admitted that he had made that statement so that Maggie Aguero, the head ombuds person, was in fact not called to recite that he had made that statement to her. But in the Tavius-Lindsay case, we presented the testimony, I believe, of Maggie Aguero, who said that she had gone to Scott Fonce on the 14th of August, and that she had a conversation where she reported that she saw, what to her were signs that many, many bad things were happening all over the prison. That prisoners were reporting abuse, that they seemed terrified, and that she said that Mr. Fonce had made this remarkable statement that perhaps they're falling out of bed or running into furniture. And it was Ms. Aguero, actually, who first said in her testimony, you know, I thought that he was in denial. That was my sense. And in the Tavius-Lindsay case, of course, then she goes up the chain and she tries to pass that on to some other people in the department, and they turn her away as well. But this kind of information, yeah, that was there in Lindsay, and perhaps it was marshaled a bit better in the Mejia's case. Of course, the injuries in Mejia's seemed to be a bit more dramatic. This bruise on the hip that appeared to be in the shape of this PR-24. The fact that the ombuds people had seen Mejia's and they had photographed his injuries and damages, and they had seen his level of fear, that he had been to internal affairs, and that he was in some kind of full-fledged panic as a result of the treatment he received and the way that he was being treated and sort of in the aftermath of all of that. So I think when you took all of those facts together, one could easily understand, number one, that punitives would be awarded, and I don't think that the, although we're not supposed to talk about ratios, the ratio here of four to one, or five to one, does not seem to be outlandish given the presentation of this case. Three and a half, I think. Yeah, it doesn't seem to be outlandish given the presentation, the facts that were at issue in this case that the jury had to decide. If we look at the closing argument, for example, we can talk about how it may have been passionate, and closing arguments should be passionate, particularly in cases where, what is it, Holmes said, you know, we're talking about the agonies of our time here. Well, let me ask you something. As I understand, one of the reasons for punitive damages to be assessed is to deter the wrongdoer from continuing his practices, right? That's so. Now, there have been, every one of these defendants, apparently, or every one of these plaintiffs, pardon me, raised the issue of punitive damages. Some recovered, some did not. Is there any doubt in your mind, although I know that we are constrained in dealing with punitive damages insofar as multiple awards of punitive damages are concerned, but is there any doubt in your mind that by this time, the defendants in this case, Mr. Fowler, Mr. Fonce, and their deputies have been deterred? Let me say this, Your Honor. Since you have brought up those awards in the special master hearing, Scott Fonce was called to testify recently in a special master hearing, and he essentially told John Bissell, retired Judge Bissell, that this was a model operation and nothing wrong had happened here. So if I measure the question of whether Scott Fonce has gotten the message from these awards. You don't think he has? I think he has not, and my understanding, and I think it's on the record in that case, that he's now in retirement, is now supervising a jail in northern New Jersey. Well, if you prevail on this case, as it presently is, he's going to have to be responsible for what? $245,000? Your Honor, again, I don't wanna go outside the record here, but certainly in our prior punitive damage awards, they were paid by the state. I didn't hear that. The prior punitive damage award that we collected in the Laverna White case, which was much smaller, it was paid by the state, as far as I understand. We got a check from the state. They covered Mr. Fonce's and the other's punitive damages. Well, we don't know whether there was some agreement that he would compensate, would then pay it back or something. I will tell you what the New Jersey statutes say, because any court anywhere can look at the statutes, that the New Jersey statutes allow the state to indemnify their employees for punitive damages, but don't require it. Therefore, if you look at the Tort Claims Act, there's a provision in that statute I'm very familiar with, whereby the Attorney General has the right, the power to do it. And our understanding and information was that they did it in the Laverna White case. Let me understand something. If you prevail in this case, what will Mr. Fonce be liable for? $245,000, as far as I can see. And also an attorney's fees award that Judge Kugler has properly entered, it seems to me in this case. Would the state be permitted to pay that? I don't know the state of the law on that, Your Honor. I just don't. But my understanding is that the state's indemnification abilities or capacities are very broad. Not their capacities, but their authority is very broad. It's simply that in these punitive situations, they cannot be compelled by the litigant, by the losing litigant, to furnish that. They cannot do that. You mean they might respond to compensatory, but not punitive? They, it would seem that the law, as I understand it in New Jersey, is that if they provide, if the Attorney General, if the state provides a defense, they must, they must pay the compensatories. I think that's a mandatory requirement under 59-10. 59-10, colon one. I understand your position. But it seems to me that in this. In the Pacific Mutual versus Haslip, the Supreme Court said an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety, and then said when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. In light of the nature of the injuries that were sustained here, why would anything larger than a one-to-one ratio be constitutionally sound? Well, it seems to me, and again, I haven't studied those particular cases, although I had the four-to-one figure in my mind from that case. We're not too far off from that, frankly. It seems to me that one of the things that we're really looking at is the relative positions of the parties, the level of moral culpability of the wrongdoer, the power relations that are instinct, that are inherent in this situation, where the wrongdoer had a responsibility to safeguard and failed, and failed after repeated notice of the problem. We're not now talking about, for example, a maritime sailor who is really an almost especially favored litigant in our federal system with all of the welter of legislation that we have that is quite solicitous of the welfare of the sailor and the longshoreman and so forth. Now, that's not what we're talking about here. We are talking about, in a sense, the least of these among us, the prison inmate who is in the most vulnerable situation. And this particular inmate was on the farm at Bayside, and the record in these cases will show that one does not get to the farm unless you are pretty much minimum custody. You're not in some kind of isolation gang environment somewhere in the basement of a prison in Essex County or in North Jersey. You're on the farm at Bayside, and this is what happens. Did Judge Kugler reason through the amount in terms of the remediator saying that 200 was right as compared to it's just too much because it is 4.5 to one? Or did he just say no, Fonce knew it was fair for the jury to find without addressing the amount specifically? I'm not sure that he was asked to make a specific evaluation, so I don't think that he did. I just read before I stood up here, Your Honor, the paragraph at the end of his written opinion. And by the way, I don't recall that we actually went and orally argued the post-trial motions. We got this opinion from Judge Kugler at some removed from actually the trial in which he recited some of the kinds of things that I have mentioned here this morning that suggested how the jury could have seen the conduct here of Mr. Fonce and the inaction as particularly egregious under all the circumstances. And I think that's a fair approximation of what Judge Kugler's view was. Thank you. Thank you very much, Your Honors. Thank you. Mr. Roselli, rebuttal. Thank you, Your Honors. Very briefly, just to clarify, with respect to the punitive damage aspect, again, I think it is significant looking at the other decisions where punitives were awarded, the amounts were severely reduced. What, were they from a master's? No, these were two jury trials. Two jury trials. But there were also jury trials where obviously there were 13 jury trials altogether, three of which awards were rendered. So obviously, there's nine, I'm sorry, there are 12, there are 12 jury trials, nine in which note where the plaintiff didn't sustain his burden of proof. And some of those trials, not all of them, Mr. Fonce also testified. So certainly, the plaintiff hadn't shown that he, his eighth amendment violations, he had sustained that burden of proof. But I think the import is that this is a unique case in and of itself. When you look at the totality of the evidence, the injury, and you compare it to the compensatory and then the punitives, it is out of whack. And I'll use that. And frankly, that was one of the things that struck me standing there when the award came back. And I have some of my own beliefs as to why that was inflated. May have been during the time of the year because it was the end of the year, near Christmas, that may have an influence or not. Although we have sat on trial courts. And Judge Kugler sits on the trial court. And we see his work a lot. And we, you know, as a district court judge, if it's out of whack, you do something about it. And clearly, he did not view it as out of whack. The only thing I would say, Your Honor, to that is that the impact of the decision may have been tempered by the fact that it was rendered a few years after the trial. Obviously, you're reading a cold record at that time. I'm not saying it did, but. That's because you asked him to hold off while you tried to settle it. Right, there was settlement discussions going on. Thank you, Your Honor. I'm not certainly blaming Judge Kugler. There were settlement discussions. But I think, again, the punitive damages are intended to be punished. Those have been awarded. I think in this instance, if you're looking at the punitives, it would be appropriate. And I would venture to say that a one-to-one, making it more equal to the compensatories would be unlawful. Thank you. Thank you, counsel. The case was well argued.